GRAVES, Circuit Judge,
dissenting:
There is insufficient evidence in this case to support a finding of reasonable suspicion. As a result, Soto’s motion to suppress should have been granted. Because I would reverse and vacate the conviction, I respectfully dissent.
This Court reviews the factual findings of the district court for clear error and its legal conclusions de novo. United States v. Olivares-Pacheco, 633 F.3d 399, 401 (5th Cir.2011). This Court reviews the denial of a motion to suppress in the light most favorable to the prevailing party. Id.
“A border patrol agent conducting a roving patrol may make a temporary investigative stop of a vehicle only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle’s occupant is engaged in criminal activity.” United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir.2001). See United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
Factors to be considered in determining reasonable suspicion include: (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent’s previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior. Brignoni-Ponce, 422 U.S. at 884-85, 95 S.Ct. 2574. See also Jacquinot, 258 F.3d at 427. “The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total.” Jacquinot, 258 F.3d at 427. “Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.” Id. at 427-28.
One of the vital elements in establishing reasonable suspicion is whether the agents had reason to believe the vehicle recently crossed the border. Id. at 428. A car traveling more than 50 miles from the border is typically viewed as being too far from the border to support an inference that it originated there. Id. “If there is *413 no reason to believe that the vehicle came from the border, the remaining factors must be examined charily.” Id.
The district court deferred to the magistrate’s findings of fact, but noted that “[e]ven with those findings, this is a close case.” Specifically, the district court further said:
The instant case is close because several Brignoni factors are missing. The stop occurred 59 miles from the Mexican border, negating the inference that the vehicle’s journey originated there. United States v. Jones, 149 F.3d 364 (5th Cir.1998). The experience of the two Border Patrol agents was relatively sparse compared to agents in many other cases. The Report’s [sic] makes little reference to the appearance of the vehicle, except that the rear and side windows were tinted. The vehicle contained only a driver and two passengers, and the Report makes no reference to the physical appearance of any of the occupants. The vehicle was not on a lightly traveled road, such as a ranch road or farm-to-market rural road. Instead, the stop occurred on Interstate Highway 35, a major national thoroughfare.
The district court then discussed the remaining factors it considered, finding the pivotal evidence to be the conduct of Delacruz, and affording lesser weight to the failure to make eye contact, the finger tapping on the steering wheel, and the registration in Kingsville.
The majority agrees that this case is decidedly close and that the paramount factor of proximity to the border is missing. As there is no evidence that the vehicle came from the border, the remaining factors must be examined carefully.
One of the critical facts relied upon by the majority is that while paralleling the Nissan, the agents observed Delacruz ducking down in the back seat as if attempting further to hide. However, only one of the agents, Abraham Esqueda, testified that he observed Delacruz ducking down while the agents paralleled the vehicle. Esqueda, who had two months of experience — a total of approximately sixteen hours of which were spent working in the area in question, relayed this information to Barberena, who merely testified as to what Esqueda told him. Barberena testified that he was driving and only glanced at the Nissan and merely saw a body in the back seat. Barberena also testified that he could not tell if Delacruz was sleeping as the agents paralleled the Nissan.
Both agents testified that when Delacruz slouched as the Nissan initially passed the agents’ parked Tahoe, he was not only obscured by the window, which was only halfway down, but also by the vertical frame of the door, indicating a person sitting back in his seat. Furthermore, upon demonstration by Barberena of Delacruz’s movement, the district court indicated “for the record” that “the agent moved over to the right of the seat and then slouched down.”[1] Barberena also testified that there was no indication that Delacruz went onto the floorboard of the car at any time.
The majority says that “Delacruz’s graphic and continuing attempt to hide from the sight of the Border Patrol officers is key to reasonable suspicion in this case — not merely the startled look on his face upon first spying the officer’s car.” The majority also suggests that the affirmative indication of an attempt to hide is *414 explicit because the stop occurred at approximately eight o’clock in the morning. I respectfully submit that the record in this matter does not support a finding of any graphic or continuing attempt to hide or that the slouching described during the hearing on the motion to suppress explicitly indicates an attempt to hide. Barberena testified that Delacruz’s look of surprise and initial slouching as the Nissan passed “looked like” Delacruz was attempting to hide. Barberena further described Delacruz’s behavior as, “[fit’s like, uh, something is not right.” That testimony was, at best, the subjective opinion of an inexperienced agent and was, at worst, mere speculation. Either way it is insufficient to support a finding of an explicit or graphic attempt to hide. Further, the only observation Barberena made of any expression or movement by Delacruz was as the Nissan quickly passed the agents’ parked location.
The majority finds that Delacruz’s behavior is akin to that of the defendant in United States v. Espinosa-Alvarado, 302 F.3d 304 (5th Cir.2002). The defendant in that case slumped down and disappeared from view when the agents appeared. However, Espinosa-Alvarado is clearly distinguishable. In Espinosa-Alvarado, the stop occurred less than one mile from the U.S.-Mexico border after sensor hits alerted agents to a border crossing. The agents had over eight-and-a-half years of combined experience, most of it in the area of the stop. The stop occurred on a desolate stretch of highway generally used by local residents as opposed to a vehicle registered out of state. The driver responded to the agents’ presence by excessively looking in his mirrors and slowing down to 10 miles below the speed limit. The paramount factor of proximity to the border existed in Espinosa-Alvarado, meaning that the other factors did not have to be examined as carefully as those in the instant case. Even so, I note that the other factors existing in EspinosaAlvarado were much stronger than those here. For these reasons, Espinosa-Alvarado is not applicable.
The majority cites United States v. Zapata-Ibarra, 212 F.3d 877 (5th Cir.2000), for the proposition that passengers commonly slump in their seats to rest and that a “more affirmative indication of an attempt to hide” is required for this factor to weigh in favor of reasonable suspicion. In Zapata-Ibarra, this Court also said: “The number of passengers and them slouching, even though ordinarily fitting with innocent travel, ‘may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.’ Accordingly, we give some weight to this factor.” Id. at 883 (internal citations and marks omitted). Zapata-Ibarra involved several slouching passengers, who appeared to be trying to avoid detection, in a van approximately twenty-four miles north of the Mexican border. The driver slowed considerably and was having difficulty keeping the van, which was registered in another city, within the lane. Despite the existence of the paramount factor of proximity to the border and the other factors listed above, this Court merely gave “some weight to this factor.” In contrast, here there were two passengers, one of whom slouched, inexperienced officers, and no evidence that the Nissan came from the border. Yet this Court now finds slouching to be a critical factor.
This Court has repeatedly held that “[wjhile such slouching is relevant, it is not sufficient even when combined with other observations, to justify the stop.” United States v. Pacheco, 617 F.2d 84, 86-87, n. 4 (5th Cir.1980) (Four aliens “hunkered down;” none testified that they “slouched” to avoid detection.). See also United States v. Orona—Sanchez, 648 F.2d 1039, *415 1041-1042 (5th Cir.1981) (Two aliens “sort of slouched down” so that agents “could only see the tops of the heads” as the agents passed. “That the two passengers ‘hunkered down’ was considered relevant but insufficient in Pacheco, even when combined with other observations, citing Lamas.”)-, United States v. Pena-Cantu, 639 F.2d 1228, 1229 (5th Cir.1981) (“[T]he passengers in the back seat were sitting low as if to avoid detection.” Further, “[t]hese facts are, however, unquestionably insufficient to justify an investigatory seizure. See United States v. Lamas ....”); and United States v. Lamas, 608 F.2d 547 (5th Cir.1979) (“Garza also testified that, as the car passed, the passengers in the back seat appeared to slouch down to avoid being seen. While this is certainly a suspicious reaction, on its own it is not sufficient to provide justification for the stop and does not add enough to Garza’s other observations to allow us to condone the stop in this case.”). Agents could clearly see into the vehicle through the front windows and the windshield. There was no testimony that Delacruz attempted to conceal himself by laying on the floor, but merely that he was concealed by the window and the vertical frame of the car as he slouched back in his seat. Further, while officers testified that Delacruz’s window was halfway down when the Nissan first passed and then was later rolled up, agents did not know when the window was rolled up or by whom. Delacruz testified that he had rolled the window up prior to passing the agents’ original stationary location because the air was blowing. In any event, the slouching of Delacruz should be afforded very little, if any, weight.
The agents chose the location where they parked because nearby bushes created an element of surprise. Barberena described the effect as, “we’ll just pop out” as a vehicle passes the location. The fact that a passenger in the Nissan was indeed surprised would be an intended and expected response and should be afforded no weight. While Barberena did at one point reference an “oh-my-god” look, he at other times described Delacruz’s expression as merely “surprised.” Also, Esqueda offered contradictory testimony, saying both that Delacruz made a “surprised expression” and that Delacruz was looking away from agents the entire time. Esqueda described the clothing that Delacruz was wearing, but Barberena testified that he could not see what Delacruz was wearing because he was visible only from the neck up as the Nissan passed the agents’ location. Further, the report prepared by Barberena referenced only “a female driver and male passenger in the front seat and an unknown person in the backseat in a blue, compact, four-door vehicle traveling north,” indicating it is unclear whether Barberena saw Delacruz’s facial features clearly enough to determine even whether he was male as the vehicle passed.
In United States v. Moreno-Chaparro, 180 F.3d 629 (5th Cir.1999), this Court said the following with regard to the government’s reliance on the surprised appearance of a passenger: “We perceive little significance in a driver looking surprised to see a Border Patrol agent parked at a closed immigration checkpoint. More is needed to articulate the mandated reasonable suspicion required for a stop by the Supreme Court’s teachings.” Id. at 632.
Based on the testimony of the agents and the applicable law, this factor should be afforded no weight in determining reasonable suspicion.
The majority finds that several other factors, including the number of passengers in the Nissan, reports of recent criminal activity, the Nissan’s registration in Kingsville and the agents’ experience, *416 “lend little or no weight” to its conclusion. These factors should lend absolutely no weight. There were three people in the Nissan — one driver and two passengers. There is nothing significant or unusual about that. There were no reports of recent criminal activity. The Nissan was registered in Kingsville and Barberena testified that it was questionable why it was on 1-35, but he also testified that a person traveling from Kingsville to Encinal would then take 1-35 north to reach Cotulla or any of several cities or towns north of Cotulla. While agents testified that 1-35 is a known smuggling route, the mere presence of a vehicle on a road frequently used for illegal activity is not sufficient to justify a stop. Jacquinot, 258 F.3d at 429. Barberena testified that there was nothing about the vehicle that would give an indication that it was carrying illegal aliens other than the registration in Kingsville.[2] The registration was unknown to Barberena until after the agents paralleled the Nissan and then ran the tag. Both Barberena and Esqueda had spent three[3] months at the Border Patrol Academy and had only two months of subsequent experience as Border Patrol agents. As stated previously, they had spent approximately sixteen hours working the area in question. The majority references Barberena’s fifteen years of prior experience working for the Laredo Police Department. However, Barberena only served as a patrolman for the first five of those years. For the following ten years he served as an investigator/detective in the special investigations unit dealing with domestic violence, child abuse and sex crimes, and then as a sergeant in the internal affairs unit. Barberena testified that this was his first alien smuggling ease as the case agent.
The majority attaches little significance to the failure of the driver to make eye contact. However, this Court has said that failure to make eye contact “cannot weigh in the balance in any way whatsoever.” United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir.1977). In Escamilla, this Court further said:
Finally, characterizing appellants’ failure to look or wave at the agents as ‘suspicious’ will place other persons driving near the border in a most precarious position. In United States v. Barnard, 553 F.2d 389, 391-92 (5th Cir.1977), the court found it suspicious that the driver of vehicle “glanced repeatedly and nervously at (a Border Patrol Agent) as he passed.” For the court to now hold that the opposition reaction to the officers’ presence is a legitimate consideration in deciding whether to stop a vehicle would put the officers in a classic ‘heads I win, tails you lose’ position. The driver, of course, can only lose.
Escamilla, 560 F.2d at 1233. This Court further elaborated on the failure to make eye contact in United States v. Lopez, 564 F.2d 710 (5th Cir.1977), as follows:
In this impersonal age, failure to make eye contact with strangers is commonplace; it may be the rule rather than the exception. Reasonable suspicion should not turn on the ophthalmological reactions of the appellant. As we noted in Escamilla, characterizing appellant’s *417 failure to look at the agents as ‘suspicious’ will place other persons driving near the border in a most precarious position.
Id. at 712.
More recently, this Court has noted that “the government has variously relied on both sides of the factor, on some occasions contending that it is suspicious for a person to look and on other occasions insisting that it is suspicious not to look,” and found that the failure to make eye contact, “taken alone or in combination with other factors, should be accorded little weight.” Moreno-Chaparro, 180 F.3d at 632. See also United States v. Rangel-Portillo, 586 F.3d 376, 381 (5th Cir.2009).
Accordingly, the failure to make eye contact should weigh against a finding of reasonable suspicion.
The majority finds that the finger tapping does not detract from the reasonableness of the agents’ suspicion. However, with regard to the driver tapping on the steering wheel, both agents testified that it appeared Garcia was playing along to music. Further, there was no evidence of Garcia speeding up, slowing down, swerving, looking into her mirrors excessively, or exhibiting any other behavior that might be consistent with nervousness. Also, Delacruz testified that the passengers were listening to music and that Garcia was playing along by tapping on the steering wheel. Tapping the steering wheel along to music absent any other evidence of nervousness should weigh against a finding of reasonable suspicion.
This Court has found reasonable suspicion to be lacking based upon the totality of the circumstances in cases factually much stronger than this. See Olivares-Pacheco, 633 F.3d at 399 (Extended cab Chevrolet pickup truck dragging some brush; not local; known smuggling corridor; passengers failed to make eye contact; passenger pointed to unremarkable field.); Moreno-Chaparro, 180 F.3d 629 (Chevrolet pickup truck with muddy underside; extremely nervous driver who slowed down and looked at checkpoint on known smuggling route and seemed surprised to see officer there.); United States v. Chavez-Villarreal, 3 F.3d 124 (5th Cir. 1993) (Older model Suburban with heavily tinted windows and out-of-state license plate traveling on known smuggling route; kept changing lanes and speeds; driver looked straight ahead and did not make eye contact.); Pacheco, 617 F.2d at 86 (Car heavily loaded on known smuggling route; “four aliens ‘hunkered down’ ” and avoided eye contact.).
The evidence presented in this case fails to create a reasonable suspicion that Soto was engaged in criminal activity at the time of the stop. This panel should reverse the district court’s ruling on the motion to suppress and vacate the conviction.

. The majority takes issue with my use of the term "slouching.” However, "for the record,” the district court indicated Delacruz slouched.

. I note that the tint of the windows is of no significance as the front windows were completely rolled down, the occupants were clearly visible, and there was no suggestion that the tint was darker than what would normally be found on a vehicle with tinted windows in Texas.

. Barberena initially testified that the program was "approximately four months long," but then later unequivocally stated it was three months.